Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Edward A. Bobrick | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8785 | **DATE** | 6/27/2002 |
| **CASE TITLE** | James Dziura vs. Jo Anne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Order. Plaintiff's motion for remand is granted. Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is denied. This matter is remanded to the Commissioner for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES DZIURA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | No. 01 C 8785 |
| JO ANNE BARNHART, Commissioner ) | |
| of Social Security, ) | **DOCKETED** |
| ) | |
| Defendant. ) | JUN 2 8 2002 |

## MEMORANDUM ORDER

Plaintiff James Dziura brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Commissioner of Social Security ("Commissioner") denying him Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.

## I. BACKGROUND

Plaintiff filed an application for DIB and SSI on December 18, 1996, alleging he was disabled since April 11, 1992, due to seizures occurring three times a week. (Administrative Record ("R.") at 101-03, 122, 602-03). His application was denied at the initial levels of administrative review (R. 31-49, 196-203, 245-61, 604-09), and he requested an administrative hearing. On September 9, 1998, an administrative law judge ("ALJ") conducted a hearing at which plaintiff, represented by counsel, appeared and testified, along with a medical expert and a vocational expert. (R. 50-100, 645-729). On November 27, 1998, after considering all the evidence of record, the ALJ found that

/6

plaintiff was not disabled because he could perform medium work. (R. 15-30). The plaintiff then filed a request for review of that decision on January 12, 1999. (R. 10-11). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the decision on September 19, 2001. (R. 6-7).

### A. Evidence of Record

Plaintiff was born on August 14, 1951, making him forty-seven years old at the time of the ALJ's decision. (R. 101). He has a high school education, a two-year associate degree in accounting, and a certificate from PC and mainframe computer training. (R. 656-58). Plaintiff last worked in April of 1992, as a computer programmer for Sears. (R. 660-61). At that time, Sears relocated and plaintiff, who does not drive, was unable to travel to and from the new suburban location. (R. 660). Plaintiff performed this job while seated most of the day, and it did not require much lifting; it was sedentary, skilled work. (R. 663,723). For the purpose of receiving DIB, it should be noted that plaintiff last met the Act's earning requirements in December of 1997. (R.25).

The medical evidence of record spans 450 pages and covers over twenty years. Much of the evidence pertains to the period before and during plaintiff's job at Sears and does little to explain how his condition became disabling at his alleged onset date of April of 1992. It does, however, demonstrate that plaintiff's condition is lifelong, with his granmal seizure activity dating from 1965. (R. 564). He has been treated with Tegretol,

Dilantin, and Phenobarbital. In addition, plaintiff has a history of psychiatric treatment as well, dating from 1986. (R. 441-474).

In June of 1986, plaintiff was hospitalized with a diagnosis of bipolar affective disorder with a manic episode. (R. 441-474). At that time, plaintiff was apparently hallucinating, seeing an "angry Jesus," and had experienced five seizures over the previous three days. (R. 443-45). He was oriented times three, but his affect was elated and expansive. (R. 451). Memory and intelligence were good. (R. 451, 462). Judgment was mildly impaired. (R. 462). His treating therapist, Dr. Stephen Kramer, reported that this psychotic break was precipitated by a falling out with his father and the psychiatric hospitalization of a close friend. (R. 475). Plaintiff was treated, and did well, with supportive psychotherapy. (R. 475). Plaintiff's brother, a police officer, testified as to two occasions where plaintiff's disorientation after seizures led to altercations and arrests. (R. 703-705).

In February of 1987, plaintiff suffered another episode in which he exploded violently and attacked his father in their home for no reason. (R. 187). He was hospitalized for psychiatric evaluation. (R. 185-195). Judgment, insight and contact were poor. (R. 187). Thought process was disordered. (R. 187). Once admitted, he stabilized quickly, and he was cooperative and articulate. (R. 188). Diagnosis was atypical psychosis, and plaintiff was discharged to continue individual therapy with Dr. Kramer. (R. 190). Upon discharge, plaintiff moved in with a friend. (190).

3

Dr. David Benson performed a consultative psychiatric evaluation of plaintiff in November of 1986, apparently in connection with a previous Application for DIB or SSI. (R. 493-94). Plaintiff described two past psychotic episodes, but demonstrated no insight into them. (R. 494). Plaintiff indicated he lived with his father in an apartment where he cooked breakfast, did a little housework, and did his own laundry. (R. 495). He said he rarely went out but, instead, watched TV or read. (R. 495). Dr. Benson felt plaintiff related adequately although in a limited degree. (R. 495). Plaintiff's mood was apathy. (R. 495). He was oriented to time, person, place, and situation. (R. 495). He did, however, often express that he had been in paradise and his father was God. (R. 496). Dr. Benson felt plaintiff had a psychotic episode that was probably related to his seizure disorder. (R. 496). There was also evidence of a personality disorder with schizoid and organic features. (R. 496).

In October of 1987, plaintiff underwent a brain MRI. The study revealed a lesion involving the pineal gland, 1.5 centimeters in diameter. (R. 403). Characteristics were thought to be consistent with a benign etiology. (R. 403). It is not clear from the record whether plaintiff was hospitalized, treated, or whether this condition was further assessed at that time. There are clinical notes from either October 8, 1987, or September 3, 1987, that indicate plaintiff's seizures were not well-controlled. (R. 387). A CT scan performed in February of 1988 showed that the lesion remained but had not increased. (R. 396). It was thought to likely be a "solid pineal tumor." (R. 396). A second MRI

4

was done in August of 1988, and it again demonstrated the pineal lesion, which again had not changed. (R. 402). The impression was of a solid, partly calcified tumor, as opposed to a cyst. (R. 402). These findings were essentially unchanged in subsequent MRIs performed in February 1989, January 1990, and December 1990. (R. 398-401). Clinical notes during this period are rather cursory, mentioning seizure frequency, medication levels, and referring to these MRI results. At one point, in March of 1988, plaintiff described an episode where he lost awareness and began speaking Polish. (R. 359). Beyond that, there is little insight from the physicians regarding any effects of the seizures or of the tumor, or any link between the two. This was, as well, during the period while plaintiff was working.

In December of 1996, plaintiff suffered a generalized seizure, was brought to the ER but discharged as stable, then found on the street with repeated seizures and readmitted. (R. 226). Apparently, plaintiff had discontinued medications as he felt they were not controlling his condition. (R. 226). Plaintiff was oriented, but exhibited cognitive deficit and poor judgment. (R. 226). He refused treatment and pulled out his IV line. (R. 227). Diagnosis was personality disorder or mild organic brain syndrome or mild post-ictal encephalopathy. (R. 227). Plaintiff again was hospitalized in January of 1997 for a blow to the head apparently suffered during a seizure. (R. 217). At that time, he was found by police. (R. 217). In February of 1997, plaintiff was taken to the emergency room after he lost consciousness during a seizure while walking in his

5

neighborhood. (R.209). He was again found by police. (R. 209). A CT scan of the brain at that time revealed no intracranial abnormality. (R. 204).

In May of 1997, Dr. Gilbert Hefter conducted a psychiatric examination of plaintiff. Plaintiff indicated that he had "taken himself off" of his seizure medication because it gave him a brain tumor. (R. 242). He said he felt better and not as tired, but added that he had a petit mal seizure that morning. (R. 242). He was oriented to time, place, and person, and responded correctly to mathematical questions. (R. 243). His judgment was somewhat impaired, as was his memory. (R.243). Dr. Hefter's diagnosis was possible cognitive, undifferentiated somataform, and personality disorders. (R. 243). He felt plaintiff's ability to do work-related activities involving understanding, concentration, persistence, and social interaction appeared intact. (R. 244). The doctor noted that Plaintiff's level of functioning was determined by his seizures and his psychological reaction to them. (R. 244).

At the administrative hearing, plaintiff testified that, essentially, he lost his job with Sears because his seizures precluded him from driving to the new suburban location. (R. 660). He testified that he still felt he could do the job he had at Sears. (R. 664). He also stated that he felt much better since he discontinued his medication. (R. 667-68). He still had seizures on a weekly basis, but he felt they were not as bad. (R. 668). He felt that stress seemed to bring on the seizures. (R. 678). Plaintiff also testified that he had problems with his memory. (R. 670). His activities were limited to walks in the

neighborhood. (R. 678). He also testified that his brother, who lived upstairs from him, checked up on him regularly. (R. 679). According to plaintiff, the doctor he saw about his pineal tumor told him to check in once a year regarding any symptoms. (R. 671-72, 682).

Dr. Oscar Davis, after reviewing plaintiff's medical file and observing the administrative hearing, testified as a medical expert ("ME"). He noted that some of the medical evidence, such as Dr. Kramer's 1986 diagnosis, were no longer current. (R. 710-11). Dr. Davis believed the diagnosable condition at the time of the hearing was schizophrenia, somataform disorder and cognitive disorder. (R. 712). Dr. Davis also testified that plaintiff's condition met the Commissioner's listing 12.02 for organic mental disorders.[1] (R. 714). The doctor noted that plaintiff suffered disorientation as to time and

---

[1] Listing 12.02 covers an organic mental disorder is a psychological or behavioral abnormality associated with a dysfunction of the brain. 20 CFR. Pt. 404, Subpt. P, App. 1, Listing 12.02. In order to establish the presence of such an impairment, the claimant must satisfy several requirements. Section 12.02 has two subparts, and a claimant must satisfy both. Part A includes loss of specific cognitive abilities, such as disorientation to time and place, memory impairment, or disturbance in mood. Pursuant to part B of Listing 12.02, the claimant's condition must result in two of the following:
  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or
  3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
  4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). 20 CFR. Pt. 404, Subpt. P, App. 1, Listing 12.02B. [FN2] If the claimant's condition fails to meet two of the four criteria of part B, he is presumptively not disabled for the purposes of Listing 12.02.

place, memory impairment, marked restriction of daily activities and social functioning, and frequent deficiencies in concentration. (R. 714-16). Myron Kline then testified as a vocational expert. The ALJ presented the VE with two hypotheticals. The first took note of plaintiff's inability, due to his seizure disorder, to perform work involving climbing, heights, or dangerous machinery. (R. 724). The VE testified that such limitations would allow plaintiff to perform his past work at Sears. (R. 724). They would also allow plaintiff to perform significant numbers of other jobs in the economy. (R. 725). The second hypothetical added an inability to recall and carry out detailed instructions and perform complex work tasks. (R. 725). The VE indicated that such limitations would rule out plaintiff performing his past work. (R. 725). They would not, however, preclude plaintiff from performing significant numbers of jobs in the economy. (R. 727). A further inability to perform at a production rate, however, would. (R. 728).

### B. ALJ's Decision

After considering all the evidence of record, the ALJ determined that the plaintiff suffered from a severe seizure disorder, and organic mental disorder, and a borderline personality disorder. (R. 25). According to the ALJ, these impairments neither met nor equaled an impairment listed as disabling in the Commissioner's regulations. (R. 25). The ALJ further found that plaintiff's allegations of disabling effects of his condition were not fully credible because they were not consistent with the medical evidence or his course of treatment. (R. 25). As a result of plaintiff's impairments, the ALJ determined

that plaintiff was limited to performing a limited range of medium work. (R. 25). According to the commissioner's regulations:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.

20 CFR § 404.1567(c); 416.967(c). The ALJ felt plaintiff was unable to perform work involving climbing, heights, and dangerous machinery, and that plaintiff was unable to recall and carry out detailed instructions or perform complex tasks. (R. 26). While this left the plaintiff unable to perform his past work, there were a significant number of jobs he could perform in the national economy. (R. 26). Accordingly, the ALJ concluded that plaintiff was not disabled under the Act. (R. 26). This stands as the Commissioner's decision and is presently before this court for review. 42 U.S.C. § 405(g).

## II. <u>ANALYSIS</u>

The applicable standard of review of the Commissioner's decision is a familiar one. The Social Security Regulations provide a five-step inquiry to determine whether a plaintiff is disabled:

1) whether the plaintiff is currently employed;

2) whether the plaintiff has a severe impairment;

3) whether the plaintiff has an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) whether the plaintiff can perform her past relevant work; and

5) whether the plaintiff is capable of performing work in the national economy.

9

20 C.F.R. §§ 404.1520; 416.920; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). The burden of proof is the plaintiff's through step four; if it is met, the burden shifts to the Commissioner at step five. *Id.*

The court must affirm this decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.* Where, as here, the ALJ denies benefits, he or she must "build an accurate and logical bridge from evidence to [his] conclusion." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). In this case, the plaintiff argues that the ALJ erroneously rejected the ME's opinion that plaintiff's condition met listing 12.02. Based on what we find to be an inadequate record in this case, and some inconsistencies in the ALJ's opinion, we agree.

In dealing with the opinion of the ME, the ALJ recalled that Dr. Davis indicated his opinion that plaintiff's condition met listing12.02 was based on two exhibits: the report of Dr. Hefter and the report of Dr. Singh. (R. 22, 716-17). The ALJ noted that Dr. Hefter found plaintiff oriented and slightly compromised in memory. (R. 22, 244). Dr. Hefter also had found plaintiff's ability to do work-related activities involving understanding, concentration, persistence, and social interaction to appear to be intact. (R. 22, 244). As the ALJ noted these finding conflict with Dr. Davis assessment that plaintiff was markedly restricted in these areas. (R. 22). The ALJ also noted that Dr. Sigh found plaintiff's impairment was not severe, as opposed to being of listing severity. (R. 22). The ALJ thus discredited Dr. Davis's opinion. Instead, he relied on Dr. Hefter's findings of slight limitations. (R. 23). He also cited Dr. Kramer's indication that plaintiff "had greatly improved by February of 1998." (R. 23). Here however, the ALJ was mistaken, as Dr. Kramer's report was from February of *1988*, some ten years before the ALJ's decision. (R. 501). The ALJ was also mistaken in characterizing Dr. Davis's testimony regarding the possible effects of plaintiff's pineal tumor as inconsistent. (R. 22). At the hearing, it appeared that the doctor testified that while he could not see the tumor in the medical records, such a tumor could adversely affect plaintiff's judgment, including his judgment regarding medical treatment. (R. 721).

While a reviewing court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner,"

the court must nevertheless look to see whether the ALJ built "a bridge from the evidence to his conclusion." *Godbey v. Apfel*, 238 F.3d 803, 807-808 (7th Cir. 2001). We cannot find that the ALJ has adequately done so in this case. While portions of the ALJ's handling of the question of whether plaintiff's impairment meets the Listings appear to be sound, others are based on mischaracterizations of the record. There is no way for the court to tell which informed the ALJ's opinion more. While we may not necessarily disagree with the ALJ's conclusion, we cannot adequately evaluate the ALJ's reasoning given these deficiencies.

The record in this case is rather poor, owing perhaps to plaintiff's refusal of treatment. That may well be tied into his psychological impairment. It may be that the pineal tumor has an affect on plaintiffs judgment, as Dr. Davis suggested. *See* 20 CFR §§ 404.1530(c); 416.930 (consideration of mental limitations in refusal to follow treatment). These questions appear to be very significant in this case, but unfortunately, they were not adequately addressed in the record. Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Failure to fulfill this obligation is "good cause" to remand for gathering of additional evidence. *Id.* In this case, certainly, a more recent psychological examination that addresses these concerns would be in order. In addition, some type of medical evidence regarding plaintiff's pineal tumor and its effects would be

as well. Then, given that information, a medical expert could be called upon to render a better-informed opinion as to whether plaintiff's condition meets the listings.

### III. CONCLUSION

For the foregoing reasons, the plaintiff's motion for remand is GRANTED. The plaintiff's motion for summary judgment is DENIED, and the defendant's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTERED: _[signature]_
**EDWARD A. BOBRICK**
**U.S. MAGISTRATE JUDGE**

**DATE:** June 27, 2002